STATE OF NORTH CAROLINA v. DANIEL MOORE BOND

No. 736SC808

(Filed 12 December 1973)

**Criminal Law § 99— court's questioning of defense witnesses — expression of opinion**
The trial court expressed an opinion on the evidence in violation of G.S. 1-180 by asking defendant and his witnesses questions which tended to impeach them and to cast doubt on their credibility.

ON *certiorari* to review judgment of *Perry Martin, Judge,* entered at the 8 May 1972 Session of BERTIE Superior Court.

By indictments, proper in form, defendant was charged with (1) the murder of William C. Bond and (2) assault with a deadly weapon with intent to kill inflicting serious injuries

State v. Bond

on James Frank Smallwood. Both offenses were alleged to have occurred on 15 August 1971. When the cases were called for trial, the solicitor announced that with respect to the murder charge the State would seek no greater verdict than murder in the second-degree. Defendant pleaded not guilty. A jury returned verdicts finding defendant not guilty on the assault charge but guilty of second-degree murder. From judgment imposing prison sentence of not less than 18 nor more than 20 years, defendant appealed.

Attorney General Robert Morgan by Raymond W. Dew, Jr., Assistant Attorney General, for the State.

Jones, Jones & Jones by L. Herbin, Jr., for defendant appellant.

BRITT, Judge.

By his assignment of error number 4, defendant contends the trial judge expressed an opinion to the jury in violation of G.S. 1-180 by extensively questioning defendant and his witnesses. The assignment is sustained.

The record reveals that in the initial presentation of its case, the State introduced three witnesses. On the initial presentation, the trial judge did not ask two of the witnesses any questions and asked the third witness two questions. Defendant then presented nine witnesses in addition to himself, the first of his witnesses being Columbus (Lump) Williams. After the examination, cross-examination and redirect examination of Williams, the following occurred:

"THE COURT: Was she open?

ANSWER BY WITNESS: No, sir.

THE COURT: What did you stop by there for if the store was closed?

ANSWER BY WITNESS: I seen a whole lot of cars up there so I went by there.

THE COURT: What business did you have there?

ANSWER BY WITNESS: I didn't have no business up there.

THE COURT: When did you stop drinking?

---

---

ANSWER BY WITNESS: That has been in 1971.

THE COURT: When were you convicted of driving under the influence?

ANSWER BY WITNESS: April.

THE COURT: What year?

ANSWER BY WITNESS: 1971."

Columbus Williams was followed on the witness stand by William Heckstall and his cross-examination was interrupted by the trial judge as follows:

"THE COURT: Mr. Heckstall, have you heard William Smallwood make a statement more than one time about whether or not he was at the scene of the death?

ANSWER BY WITNESS: I have not heard it but one time and that was when he came to my house.

THE COURT: You have not heard him say anything about it since then?

ANSWER BY WITNESS HECKSTALL: No, not since that Sunday morning.

THE COURT: After the death?

ANSWER BY WITNESS: Yes, after the death."

While defendant was on the witness stand and following his direct examination, cross-examination, redirect examination and further cross-examination, the record discloses the following:

"EXAMINATION BY THE COURT:

Q. Are you all through? At the time you saw Stanley Bond could you tell that he had been in trouble?

A. Well, not exactly, but he blowed real loud when he gets out of breath.

Q. He blows real loud ordinarily?

A. Sometimes.

Q. Was he lying in the ditch?

A. No, he was standing in the ditch.

State v. Bond

Q. And you wanted to go ahead and take him home?

A. That is right.

Q. And you had gotten in the car and sat down?

A. Right.

Q. How far away were these two men you said were James Frank Smallwood and Willie C. when you saw them?

A. About half a car length.

Q. You were already sitting in the car?

A. I was standing there then waiting for Stanley to sit down.

Q. Waiting on him?

A. Yes, sir.

Q. Did the car have glasses in it where you could roll them up and down?

A. Yes, sir.

Q. Did it have locks on the doors?

A. It had some, but the door was not locked.

Q. The glass on your side did have a glass in it, the window on your side, didn't it?

A. Yes, sir.

Q. And the door on the left side did have a lock in it?

A. The left-hand side?

Q. The driver's side?

A. Had a lock?

Q. Had a button to push down?

A. Yes, sir.

Q. Did you at any time call your wife that night and let her know where you were, did you?

A. I don't have a phone.

Q. You don't have one at your home?

A. No, sir."

Following the examination and cross-examination of defense witness Stanley Haywood Bond, the record sets forth the following:

"EXAMINATION BY THE COURT:

Q. Mr. Bond, you indicated in your testimony you were receiving a check from the government each month, is that correct?

A. Yes, sir.

Q. What is the check for?

A. Well, during my tour in Viet Nam like I stated earlier I got wounded in Viet Nam and so the check is for that.

Q. Because you were wounded in service?

A. Yes, sir. The check is for that.

Q. For the injury in your heel?

A. Yes, sir.

Q. What percent of disability do you draw?

A. Like you say 100% maybe.

Q. Do you draw 100%?

A. Yes, sir.

Q. Is the only disability you have in your heel?

A. Well, no. While I was in the VA hospital I applied for more, well, disability.

Q. Why?

A. Why?

Q. Yes.

A. Because, first of all, I stutter sometime.

Q. You stutter?

A. Yes, sir.

Q. Did you stutter before you went into the army?

A. No, sir.

Q. Do you have any card to show your disability that you draw?

A. What type of card?

Q. Anything in your pocketbook. Any type or piece of paper in your pocketbook that would show the type of disability that you are drawing?

A. No, sir.

Q. Do you have anything like that anywhere?

A. Somewhere? Some card or papers?

Q. Yes.

A. That would show the disability that I draw?

Q. Yes.

A. That is a broad statement, but let's see. Ah, oh, no sir, no sir.

Q. Do you have a copy of your discharge?

A. Papers?

Q. Yes, sir.

A. Yes, at home.

Q. Do you know what I mean by 308 or 309 discharge?

A. No, but you can explain it to me.

Q. Are you not in fact drawing 100% disability for mental disability?

A. Well, with a combination of the three, these can be compared as one, you know, to come together as one problem.

Q. That is as clear as you can answer my question, is it not?

A. Yes, sir.

THE COURT: All right."

After defendant rested his case, the State offered several witnesses in rebuttal. Among those was Marie Smallwood and

State v. Bond

at the conclusion of her testimony the record discloses the following:

"COURT: 'All of these men were out there without their wives as far as you know, weren't they?' Answer by witness: 'I don't know, I was not there.' "

It is well settled that in the trial of criminal actions, the court may ask a witness questions designed to obtain a proper understanding and clarification of the witness' testimony or to bring out some fact overlooked, but the court may not ask a defendant or a witness questions tending to impeach him or to cast doubt upon his credibility. *State v. McEachern,* 283 N.C. 57, 194 S.E. 2d 787 (1973); *State v. Frazier,* 278 N.C. 458, 180 S.E. 2d 128 (1971); *State v. Kirby,* 273 N.C. 306, 160 S.E. 2d 24 (1968); *State v. Lowery,* 12 N.C. App. 538, 183 S.E. 2d 797 (1971); *State v. Pinkham,* 18 N.C. App. 130, 196 S.E. 2d 290 (1973). The judge must exercise great care to see that nothing he does or says during the trial can be understood by the jury as an expression of an opinion on the facts or conveys an impression of judicial leaning. *State v. Lynn,* 246 N.C. 80, 97 S.E. 2d 451 (1957); *State v. Battle,* 18 N.C. App. 256, 196 S.E. 2d 536 (1973). See also *State v. Sharp,* 18 N.C. App. 136, 196 S.E. 2d 371 (1973) and *State v. Hewitt,* 19 N.C. App. 666, 199 S.E. 2d 695 (1973).

We hold that in the case at bar, the court's questions tended to impeach defendant and his witnesses or to cast doubt on their credibility, entitling defendant to a new trial. We find it unnecessary to discuss the other assignments of error argued in defendant's brief.

New trial.

Judges CAMPBELL and MORRIS concur.